FILED - USDC -NH
2026 APR 3 PM2:13

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

CAROL L. BARSKY, M.D.,           )
                                 )
        Plaintiff,               )
                                 )
    v.                           )           Docket No. _____
                                 )
DARTMOUTH-HITCHCOCK              )           Jury Trial Demanded
MEDICAL CENTER,                  )
DARTMOUTH-HITCHCOCK              )
CLINIC, MARY HITCHCOCK          )
MEMORIAL HOSPITAL, and          )
DARTMOUTH-HITCHCOCK              )
HEALTH,                          )
                                 )
        Defendants.              )

## COMPLAINT

Dr. Carol L. Barsky (Plaintiff or "Dr. Barsky") brings these claims against Dartmouth-Hitchcock Medical Center ("DHMC"), Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, Defendants or "Dartmouth Health") to recover damages and other relief for unlawful and retaliatory termination.

When Dartmouth Health learned that their supply chain was fraught with ethical, legal, and quality issues, they were duty-bound to investigate and take reasonable steps to mitigate any harm that may have occurred—including any harm to patients, providers, and other staff—and to prevent similar issues in the future. When Dr. Barsky was asked by Dartmouth Health's Board of Trustees to evaluate quality problems within the supply chain, she did so honestly and thoroughly. When Dr. Barsky attempted to mitigate the safety risks revealed in her investigation, Dartmouth Health's President and Chief Executive Officer ("CEO"), Dr. Joanne Conroy,

obstructed her plans, interfered with her presentation to the Board, and minimized her findings. Dr. Barsky continued the work the Board had asked her to do, despite encountering resistance, bullying, and harassment from institutional leadership. And then, in January 2026, she was fired.

In January of 2025, the Dartmouth Health Board of Trustees directed Dr. Conroy to have Dr. Barsky, as Dartmouth Health's Chief Quality and Value Officer, investigate product-safety concerns and the potential impact on patients and staff. Dr. Barsky determined that large quantities of medical supplies procured by the former Vice President for Purchasing and Supply Chain ("VP of Supply Chain"), at great cost to the institution, were of uncertain provenance, purchased on the "gray" market,[1] and were likely not safe for use in clinical care. When the inquiry also revealed failures in oversight by the Chief Operating Officer (and close personal friend of Dr. Conroy) that led to his eventual resignation, Dr. Conroy was furious[2] and began a concerted program of retaliation culminating in Dr. Barsky's termination on the pretextual grounds of "bullying" a colleague.

### Parties, Jurisdiction, and Venue

1. Dr. Barsky is a resident of Lebanon in Grafton County, New Hampshire, and the former Chief Quality and Value Officer for Dartmouth Health.

2. Dartmouth-Hitchcock Health is a New Hampshire nonprofit corporation located in Lebanon, New Hampshire. Dartmouth-Hitchcock Health operates a healthcare delivery

---

[1] "White Market" refers to the legal, official, or authorized market for goods and services, using authorized channels, manufacturers, and distributors, whereas the "Black Market" uses illicit channels to exchange goods and avoid government sanctions. The "Gray Market" is somewhere in between.

[2] On April 1, 2025, Dr. Conroy left a voicemail for Dr. Barsky stating: "Carol. This is Joanne. I need you to call me back. I am very angry, and I expect you know why."

system throughout northern New England under the trade name Dartmouth Health. Dartmouth-Hitchcock Health is governed by the Dartmouth Health Board of Trustees.

3. Defendants Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Medical Center are New Hampshire nonprofit corporations, located in Lebanon, New Hampshire, and members of the Dartmouth Health system. These entities are governed by the Dartmouth-Hitchcock Board of Trustees.

4. Dartmouth-Hitchcock Clinic serves as the employing entity for professional staff at Dartmouth Health, including Dr. Barsky.

5. DHMC is Dartmouth Health's flagship hospital and New Hampshire's only academic medical center.

### Dr. Barsky's Career and Role at Dartmouth

6. Dr. Barsky is an emergency physician known nationally and internationally for her expertise in quality and safety in the healthcare industry. She has received multiple awards for her work and is often asked to serve on advisory panels as a subject-matter expert.

7. She is an Associate Professor of Emergency Medicine at the Geisel School of Medicine at Dartmouth, an Associate Professor of Health Policy and Clinical Practice at The Dartmouth Institute at Geisel, and she teaches at the Tuck School of Business at Dartmouth.

8. Dr. Barsky was hired in 2021 as the Chief Quality and Value Officer ("CQVO") for Dartmouth Health.

9. The terms and conditions of Dr. Barsky's employment were outlined in a letter agreement dated January 26, 2021.

10. Dr. Barsky's CQVO responsibilities included "provid[ing] leadership for [Dartmouth Health] system-wide quality, safety, patient experience and value initiatives, with a focus on strategic development and implementation of a comprehensive value measurement and improvement program and promotion of a culture of high reliability, value and safety for both patients and employees."

11. The CQVO position "[h]as direct authority and accountability for decisions regarding [the] need to halt clinical operations due to safety concerns with appropriate coordination with clinical leadership."

12. Initially, Dr. Barsky reported to the Chief Clinical Officer; at the time of her termination, Dr. Barsky reported directly to Dr. Conroy.

13. Throughout her tenure, Dr. Barsky also reported quarterly to the Value Committee of the Dartmouth Health Board of Trustees.

14. Dr. Barsky started at Dartmouth Health during the COVID pandemic.  Her wealth of experience and commitment to patient safety enabled her to drive improvements and provide significant value to Dartmouth Health during an exceptionally challenging time.

15. Dr. Barsky achieved many improvements and accomplishments in just under five years at Dartmouth Health.  Among these she:

    a. Achieved significant reductions in inpatient mortality and hospital-acquired infections and improvement in Consumer Assessment of Healthcare Providers

4

and Systems ("CAHPS"),[3] leading to 4-star rankings (out of 5 possible) for all member hospitals ranked this year.

b. Developed a quality scorecard for Dartmouth Health with each system member aligned to the Centers for Medicare & Medicaid Services ("CMS") star ranking measures.

c. Led the Value Institute, which is Dartmouth Health's quality improvement leadership body. Among other functions, the Value Institute trains individuals in skills needed to participate in, design, and/or lead quality improvement and value creation initiatives.

d. In conjunction with health system member CEOs and local quality leaders, developed and executed a three-year strategic plan for quality.

e. Educated key stakeholders on requirements for the new CMS Patient Safety Structural Measure ("PSSM").

f. Held a two-day training session for Dartmouth Health member boards and board members from other US healthcare organizations.

g. Established the first Patient Safety Organization ("PSO")[4] in New Hampshire.

h. Established vice chair positions in clinical departments to train physicians to lead quality initiatives in their respective specialties.

---

[3] CAHPS refers to a set of patient experience surveys developed by the Centers for Medicare & Medicaid Services and approved for use by the Agency for Healthcare Research and Quality. Survey results are reported publicly. Participation in certain CAHPS surveys is required to avoid reduction in CMS payments to providers.

[4] A PSO is a federally-certified entity established under the 2005 Patient Safety and Quality Improvement Act that analyzes voluntarily-reported data on safety incidents in a legally-protected, confidential environment to help healthcare providers improve patient safety and healthcare quality and encourage a culture of safety.

    i.  Collaborated with faculty at The Dartmouth Institute to extend the work of the Promise Partnership Learning Health System, in which improvement teams apply a learning health systems approach[5] to improve the experience of care.

16. Over the past two years, Dr. Barsky has received the maximum available bonus each year, reflecting the value of her contributions.

**Supply Chain Concerns**

17. On January 17, 2025, the Dartmouth Health Board of Trustees asked Dr. Conroy to have Dr. Barsky investigate whether any patients or staff had been harmed by defective products in the Dartmouth Health supply chain and to report on her findings within the month.

18. Dr. Barsky learned that Dartmouth Health had been notified in 2024 about potential irregularities and conflicts of interest in the Supply Chain department.

19. An outside law firm was retained to investigate these allegations.

21. The purchase and use of gray market products introduces significant risk into the supply chain.

22. During the COVID pandemic, severe disruptions in the global supply chain forced many organizations, including Dartmouth Health, to purchase gray market products;

---

[5] A learning health system approach focuses on continuous learning, improvement, and innovation. Different stakeholder groups (e.g., researchers, patients, clinicians, and health system leaders) work together to identify knowledge gaps, translate research into clinical practice, and implement best practices.

however, virtually all healthcare organizations ceased this practice as shortages eased and the pandemic ended.[6]



24. Dartmouth Health had nevertheless continued to purchase products from gray market vendors after pandemic shortages had decreased and despite known product quality issues.

26. To avoid conflicts of interest, standard compliance practice in healthcare and internal policy compels professionals at Dartmouth Health to disclose any ownership interest in any health care entity or company, supplier, or other organization doing business with or affiliated with Dartmouth Health.



---

[6] The World Health Organization declared that COVID-19 was no longer a global health emergency as of May 5, 2023.

[REDACTED]

[REDACTED]

29. However, the Chief Operating Officer ("COO"), to whom the VP of Supply Chain reported, failed to implement any significant changes to supply chain practices, allowing problematic purchases to continue.

30. At a meeting of the Dartmouth Health Board on January 17, 2025, the outside law firm presented its report.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

32. The concerns expressed at the meeting prompted the Board's request to have Dr. Barsky investigate.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

35. As instructed by the Board, Dr. Barsky conducted an investigation and prepared an institutional action plan.



37. Dr. Barsky set up a supply chain improvement committee and worked with leadership at the Value Institute to analyze supply chain issues and deploy staff to implement changes that would improve safety practices.

38. Committee members collected all safety event reports submitted in 2024 concerning supplies (the majority of which had previously been routed only to supply chain leadership).

39. Dr. Barsky obtained a preliminary list of gray-market vendors and compiled a list of products purchased from these vendors.

40. Dr. Barsky's investigation was one of three independent, but related, evaluations of Dartmouth Health's supply chain: the outside law firm evaluated potential legal violations; Vizient, a company that partners with healthcare organizations on supply chain management, evaluated Supply Chain's processes; and Dr. Barsky evaluated safety concerns. Each investigation found significant supply chain deficiencies in their respective domains of inquiry.



42. Vizient identified numerous deviations from industry best practices, including a lack of controls and safety measures in Supply Chain's policies and procedures.

45. Dr. Barsky identified significant gaps and questionable practices in the processes and procedures of the Supply Chain department that permitted purchases of products of unknown safety from unverified/unauthorized vendors.

46. Healthcare organizations need robust policies for vendor credentialing to remain in compliance with Joint Commission, CMS, Occupational Safety & Health Administration, and Health & Human Services standards, among others.

47. With limited exceptions, payments are prohibited from any Federal health program for any items or services furnished, ordered, or prescribed by excluded or debarred individuals or entities.



49. Dartmouth Health's flawed supply chain processes that had failed to adequately flag or prevent improper purchases also left open the risk that purchases could be made from an excluded or debarred vendor.

50. Dr. Barsky had significant concerns around patient and employee safety—and corresponding noncompliance with federal and state laws—if the purchase and use of the questionable products was allowed to continue. She repeatedly reported her concerns to executive leadership and the Board.

51. Protective equipment, such as examination gloves, is worn by providers and healthcare personnel who perform potentially risky and intimate procedures on patients, such as drawing blood, pelvic examinations, and rectal examinations. Unexpected failures risk patient and staff exposure to health risks, including potentially lethal infections such as HIV, Hepatitis B, and Hepatitis C.

52. As a hospital that receives federal CMS funds, Dartmouth Health is required to adhere to the CMS Conditions of Participation. *See* 42 C.F.R. § 482 *et seq.* In relevant part, the conditions of participation mandate that a "patient has the right to receive care in a safe setting," 42 C.F.R. § 482.13(c)(2), and that a "hospital must be in compliance with applicable Federal laws related to the health and safety of patients." 42 C.F.R. § 482.11(a).

53. In February 2025, Dr. Barsky presented to the Board her preliminary findings and mitigation plan to address existing safety issues and prevent future incidents. Her plan included sequestration of all products from gray-market vendors pending testing; implementation of stronger internal processes and controls to limit purchases to verified vendors; improved tracking of safety recalls; and a system-wide leadership structure to improve oversight, among other actions.

54. Prior to the meeting, Dr. Conroy and the COO were unusually focused on what Dr. Barsky planned to share in her presentation and made edits to her slides and talking points that downplayed safety risks and exaggerated improvement activities.

55. This heightened involvement by the CEO and COO was unusual. Dr. Barsky routinely made presentations to the Board, and Dr. Conroy typically declined to review slides in advance.

56. In 2022, Dr. Conroy had changed the reporting structure so that Dr. Barsky reported to the COO. The COO was a long-time colleague and close personal friend of Dr. Conroy. They had previously worked together at the Lahey Health system in Massachusetts, and Dr. Conroy recruited him to join her at Dartmouth Health in 2017. After the Board asked Dr. Barsky to investigate quality problems within the supply chain and that investigation raised concerns involving the COO, Dr. Barsky requested a reporting change to avoid a conflict of interest.

57. Dr. Barsky sought to have all questionable products identified and sequestered pending the outcome of further testing and analysis.

58. Dr. Barsky's improvement committee started with the removal and replacement of examination gloves, which had received the highest number of safety reports, at Dartmouth Health's Community Group Practices.

59. But when Dr. Barsky started to do the same at DHMC, Dr. Conroy objected to anyone going into DHMC clinics to swap out gloves.  She claimed the reported safety issues were merely "anecdotal."  Dr. Barsky complied and did not remove gloves that had already been distributed to clinical areas at DHMC.

60. When Dr. Barsky instead notified relevant stakeholders at DHMC that she would swap out gloves on the supply carts before they were distributed to the clinical areas, Dr. Conroy (on her way to a golf weekend with the COO) called to berate her, accused Dr. Barsky of being insubordinate, and ordered her not to change out any gloves at DHMC.

61. Following this incident, a health system employee warned Dr. Barsky that she had overheard Dr. Conroy in her office, loudly ranting about firing Dr. Barsky.

62. Dr. Barsky contacted Dartmouth Health's General Counsel about Dr. Conroy's behavior and expressed concerns about retaliation.

63. Dr. Conroy eventually agreed to have the gloves tested by ECRI, an outside PSO that provides, among other services, safety testing of medical products and supplies.

64. Employers are required to select and provide employees with "appropriate hand protection" based on "the task(s) to be performed, conditions present, duration of use, and the hazards and potential hazards identified." 29 C.F.R. § 1910.138(b).

65. Nitrile gloves used for patient examinations must comply with minimum acceptable quality levels set by the FDA.  Although ECRI ultimately determined that the gloves were technically compliant with bare minimum requirements, they nevertheless

suggested it may be best to reserve the gloves for non-clinical uses and monitor them for defects.

66. In April of 2025, Dr. Barsky was asked to make a report to the full Board.

67. Dr. Conroy repeatedly interrupted, contradicted, and otherwise censored Dr. Barsky during her presentation to the Board.



70. After the meeting, several Board members and executives contacted Dr. Barsky to thank her for her candor and concern about the supply chain and to comment on the inappropriateness of Dr. Conroy's behavior during the meeting.



72. Following the COO's departure, the interim VP of Supply Chain was reassigned to report to the Chief Clinical Officer.  Dartmouth Health hired a new VP of Supply Chain in August 2025.

73. Dr. Barsky's improvement work in Supply Chain continued.

74. In the summer of 2025, she worked on establishing a reliable process for resolving supply chain safety issues and tracking recalls.

14

75. Dartmouth Health had failed to install and use software provided by ECRI that would have identified safety concerns about healthcare products used at other US hospitals.

76. When reports on other products tested by ECRI (e.g., tracheostomy tubes) indicated deviations from standard specifications, Dr. Barsky shared the report with the physicians using those products to solicit their experience and opinion on usability and safety.

77. As of January 2026, when Dr. Conroy terminated Dr. Barsky's employment, the process and safety concerns in Supply Chain had not been fully remediated.

### Exclusion and Retaliation

78. Throughout 2025, Dr. Conroy's behavior towards Dr. Barsky continued to deteriorate.

79. Dr. Conroy excluded Dr. Barsky from critical meetings, opportunities, and decisions.

80. Dr. Barsky was excluded from interviews with candidates for officer and executive positions. Previously, she was routinely included in searches for key positions.

81. The exclusion was deliberate.

82. An email sent in connection with the search for a replacement COO explicitly stated that Dr. Barsky was not to participate in the interviews.

83. Dr. Conroy similarly refused a request from the retiring CEO of a hospital in the Dartmouth Health system to appoint Dr. Barsky to the search committee for their replacement.

84. Dr. Conroy denied a request from another member-hospital CEO to appoint Dr. Barsky to that hospital's board. Dr. Barsky was the only employee at her level not assigned to serve on a system member's board.

15

85. The value analysis team that had been transferred from Supply Chain to assist Dr. Barsky in the spring of 2025 was transferred back to Supply Chain by Dr. Conroy in the fall of 2025 without consulting Dr. Barsky.

86. Dr. Conroy singled out the Value Institute and the quality improvement division at DHMC for harsher budget cuts than other departments and ignored information indicating that the cuts were based on faulty data.

87. Dr. Conroy changed the reporting structure of Dr. Calderwood, the Chief Quality Officer of DHMC, without notifying Dr. Barsky, even though Dr. Calderwood had reported to Dr. Barsky.  Furthermore, she explicitly instructed Dr. Calderwood not to inform Dr. Barsky of the change.

**Toxic Leadership, Unequal Treatment, and Pretextual Termination**

88. In a process that was highly irregular, Dr. Barsky's employment was verbally terminated by Dr. Conroy on January 20, 2026.

89. Dartmouth Health alleges that a comment made by Dr. Barsky on January 8, 2026, violated the Disruptive Behavior Policy and Code of Conduct.

90. The comment in question occurred after a meeting in which Dr. Conroy was demanding onerous cost reductions and layoffs.  The Chief Human Resources Officer had opined that having two chief quality officers was not necessary, noting, "Carol [Barsky] works across the system; Michael [Calderwood] is only at Dartmouth Hitchcock."

91. Dr. Barsky checked in with Dr. Calderwood after the meeting, which had, understandably, left him concerned about the future of his position.  Not wanting to downplay the risk, Dr. Barsky suggested that he proactively look at alternative open positions at Dartmouth Health, just in case.

16

92. Dr. Calderwood's supervisor and another meeting participant also checked in on him, with similar concerns.

93. Dartmouth Health alleges that Dr. Barsky's employment was terminated for cause "due to serious concerns regarding a pattern of your disruptive, unprofessional, and insubordinate conduct."

94. The purported justification for Dr. Barsky's termination was pretextual and not factually accurate.

95. The decision to terminate her employment was made prior to any discussion with Dr. Barsky to determine whether the conversation with Dr. Calderwood had taken place or to obtain her perspective on the alleged incident.

96. Although the 2021 Letter of Agreement provides for termination for cause upon written notice, written notice was not provided until February 9, 2026.

97. The written notice alleges prior "unprofessional interactions" that either did not occur or are misrepresented. Moreover, these alleged incidents, including one supposedly "final" warning, are not documented in her personnel file.

98. Following her termination, Dr. Barsky heard from former coworkers that they were instructed not to communicate with her about anything related to work.

99. The abrupt termination and loss of access to her office and files prevented and/or significantly delayed Dr. Barsky from retrieving her personal belongings and information, such as materials needed to teach scheduled classes at Dartmouth College's Tuck School of Business, and caused additional stress.

100. From the beginning of her employment at Dartmouth Health, Dr. Barsky experienced and observed numerous examples of problematic leadership and unequal

treatment of employees as well as a variety of derogatory, insensitive, and unprofessional comments based on protected characteristics such as religion, gender, race, and national origin.

101. Less than a month after she started at Dartmouth Health, Dr. Barsky confronted her male supervisor, the Chief Clinical Officer, about his bullying and discriminatory behavior.

102. The Chief Clinical Officer told Dr. Barsky: "You are not in Israel; you can't behave that way here."

103. Other slights have been more subtle:

   a. The same Chief Clinical Officer wrongfully accused Dr. Barsky of falsifying her *curriculum vitae* by claiming that she had received a national award that did not exist—despite the framed award hanging in full view on her office wall.

   b. On multiple occasions, Dr. Conroy held important meetings during Jewish holidays and either ignored the needs of Jewish leaders to observe religious holidays or expressed annoyance at having to accommodate them.

   c. The Chief Human Resources Officer belittled Dr. Barsky for talking with her hands.

104. All three leaders continue to work at Dartmouth Health.

105. Dr. Barsky was a member of Dartmouth Health's Diversity, Equity Impact and Belonging Working Group and the Physician Women in Leadership Working Group.

106. She was often asked to serve in a mentor role for individuals associated with Dartmouth Health, many of whom found the Dartmouth Health environment to be

inhospitable for people in the various protected classes, such as race, religion, national origin, gender, etc.

107. Instead of praising Dr. Barsky's efforts to make employees and residents from diverse backgrounds feel more welcome and supported, Dr. Barsky was chastised and told to stop her mentoring activities.

## Count I
### Wrongful Termination in Violation of Public Policy

108. Plaintiff repeats and realleges each allegation of this Complaint as though restated here.

109. Dartmouth Health terminated Dr. Barsky's employment in bad faith, with malice, and in retaliation for performing acts that public policy would encourage (acts that were required medically, ethically, and regulatorily) and for refusing to perform acts that public policy would condemn (acts that were forbidden medically, ethically, and regulatorily).

110. Dartmouth Health is obliged to provide a safe environment for their employees to work and their patients to receive treatment.

111. Dr. Barsky advocated for transparency and remediation of issues in the supply chain that had the potential to impact patient and employee safety.

112. Dr. Barsky reasonably believed that certain supplies purchased by Dartmouth Health from gray market vendors posed an unacceptable risk to employee and patient health and safety and sought to sequester those products until their safety could be determined.

19

113. Dr. Conroy censored and distorted Dr. Barsky's reports and downplayed the severity of the supply chain issues, blocked her from removing potentially substandard supplies, and ultimately terminated Dr. Barsky's employment.

114. In addition, Dr. Barsky was a mentor and supporter of other employees experiencing discrimination or other workplace challenges related to their gender, race, religion, national origin, etc.

115. Dartmouth Health objected to her support of such employees and attempted to prohibit her from continuing to do so.

116. Public policy, in the form of good medical practice, ethics, and federal and state laws and regulations, supports patient and employee safety and condemns an employer that attempts to chill employee conversations about working conditions or to prohibit reporting of discrimination and retaliation.

117. Dr. Barsky's employment was terminated, and she was otherwise harmed as a result of Dartmouth Health's actions.

**Count II**
**New Hampshire Whistleblower Protection Act, RSA 275-E:2**

118. Plaintiff repeats and realleges each allegation of this Complaint as though restated here.

119. New Hampshire law protects employees who, in good faith, report suspected violations of the law or who object to or refuse to participate in activities that they reasonably believe to be in violation of the law.

20

120.    Dr. Barsky reported, in good faith, acts and omission that she reasonably believed violated laws and rules related to product quality, patient and employee safety, and others related to healthcare systems.

121.    Dr. Barsky objected to performing actions she reasonably believed would violate laws and rules related to quality, safety, and other healthcare system obligations.

122.    As a consequence of her reports, actions, and objections, Dr. Barsky was harassed, threatened, discriminated against, and ultimately her employment was terminated in retaliation.

123.    Dr. Barsky has been harmed as a result of Dartmouth Health's improper actions.

**Count III**
**Violation of the Anti-Retaliation Provision of the**
**Federal False Claims Act, 31 U.S.C. § 3730(h)**

124.    Plaintiff repeats and realleges each allegation of this Complaint as though restated here.

125.    The False Claims Act imposes liability on persons who knowingly make false claims or representations material to a false claim to the Government.

126.    The Act protects from discrimination and retaliation persons who investigate, report, or otherwise try to stop suspected violations of the Act.

127.    Internal complaints that allege concerns about potential fraud on the government are protected conduct.

128.    Dr. Barsky engaged in protected activities, including investigating and internally reporting on what she reasonably believed was possible fraud on the government.

129.    Dartmouth Health knew about Dr. Barsky's protected activities.

130.    Dartmouth Health discriminated against and ultimately terminated Dr. Barsky because of her protected actions.

131.    Dr. Barsky has been harmed as a result of Dartmouth Health's improper actions.

### Requested Relief

Plaintiff demands relief as follows:

A.  An award of damages, including back pay, future lost wages, harm to reputation, etc.

B.  Punitive or enhanced damages.

C.  Appropriate equitable and injunctive relief.

D.  Reinstatement.

E.  Other damages and relief as appropriate.

F.  Interest.

G.  Attorney's fees and costs of litigation.

Respectfully submitted,

VITT & NUNAN, PLC

Date: April 3 , 2026                By:    _____

Sarah Merlo (NH Bar #20361)
Geoffrey J. Vitt (NH Bar #9095)
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
smerlo@vittnunanlaw.com
gvitt@vittnunanlaw.com

*Counsel for Dr. Carol Barsky*

22